IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 22, 2010

## CHARLES LEE ROCHELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2006-A-150     Cheryl Blackburn, Judge**

---

**No.  M2010-00150-CCA-R3-PC - Filed September 29, 2010**

---

Petitioner, Charles L. Rochelle, was indicted by the Davidson County Grand Jury for aggravated robbery, aggravated assault, evading arrest while operating a motor vehicle, reckless endangerment, and possession of marijuana.  Petitioner pled guilty to evading arrest and was convicted of aggravated robbery and aggravated assault after a jury trial.  The remaining charges of reckless endangerment and possession of marijuana were dismissed.  As a result of the convictions and guilty plea, Petitioner was sentenced to twelve years for aggravated robbery, ten years for aggravated assault, and eight years for evading arrest.  The sentences were ordered to be served consecutively, for a total effective sentence of thirty years.  The convictions were affirmed on appeal.  *State v. Charles L. Rochelle*, No. M2007-00367-CCA-R3-CD, 2008 WL 762488 (Tenn. Crim. App., at Nashville, Mar. 24, 2008).  Petitioner then sought post-conviction relief on the basis of ineffective assistance of counsel.  After a hearing, the post-conviction court dismissed the petition.  On appeal, Petitioner argues that the post-conviction court improperly dismissed the petition for post-conviction relief.  After a review of the record, we determine that  Petitioner has failed to show that he received ineffective assistance of counsel.  Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Charles L. Rochell.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

At trial, the following testimony, as summarized by this Court on direct appeal, led to Petitioner's convictions:

Patricia Talley testified that she worked as a cashier at the Family Dollar Store in Goodlettsville, Tennessee on October 15, 2005, when the store was robbed. While stocking shelves in the store, she saw [Petitioner] , who motioned with his finger for her to come over to him. [Petitioner] walked alongside her down the aisle, and told her that his wife had asked him to get something, but he could not remember what he was supposed to get. As they reached the back of the store, [Petitioner] told her he wanted money. She informed [Petitioner] that she did not have the key to the office where the money was kept and that the manager was the only person with the key.

Ms. Talley testified that [Petitioner] told her to call the manager, Virginia Swezea. When Ms. Swezea arrived at the back of the store, [Petitioner] had a gun trained on Ms. Talley and told Ms. Swezea that he wanted her to open the door. Ms. Swezea opened the door and the three went up the stairs to the office. When [Petitioner] told them again what he wanted, Ms. Swezea told him it was sitting in a drawer on top of the store safe. Ms. Swezea then picked up the money and handed it to [Petitioner], who stuffed it in his pocket. [Petitioner] told Ms. Swezea that if that was not all the money he would "blow her head off." Ms. Swezea informed [Petitioner] that he had all the money. [Petitioner] then told the two women to get on the floor under the desk and count to twenty. [Petitioner] ran out of the store. Ms. Talley stated that they counted to twenty, got up, and called 911. Ms. Talley was shown a gun and identified it as the gun [Petitioner] used during the commission of the robbery. She said that she was approximately five feet tall, and she admitted that at the preliminary hearing she testified that she thought [Petitioner's] height to be about six feet.

Ms. Talley testified that it was Ms. Swezea who spoke with the police over the phone and gave them a description of [Petitioner]. She stated that [Petitioner] had a "small gun," but she did not know anything about guns. She described [Petitioner] as wearing a sock hat, a dark hat, a dark jacket and dark pants. Ms. Talley testified that [Petitioner] took approximately $1,400. She

stated that after the robbery she attended a preliminary hearing where [Petitioner] appeared. She recalled that she was not able to identify [Petitioner] based solely on facial identification, but after observing his mannerisms and hearing him speak, she was able to identify him as the man who had robbed the store.

On cross-examination, Ms. Talley admitted she told police officers that [Petitioner] had short hair and brown eyes, but she had assumed this to be the case as [Petitioner] wore a sock hat and sunglasses during the robbery. She stated that there was nothing outstanding or unusual about [Petitioner's] appearance on the day of the robbery. She testified that when she saw [Petitioner] prior to trial at the preliminary hearing, it was [Petitioner's] walk and mannerisms that triggered her recollection of him as being the one who robbed the store. She also admitted that Ms. Swezea told her how much money was stolen. Ms. Talley also admitted that she had previously testified that [Petitioner's] gun was silver. She acknowledged that her testimony at that time was different than her testimony at trial, when she identified the black gun shown to her as [Petitioner's] gun.

Virginia Swezea testified that she was the Assistant Manager of the Family Dollar Store. On the afternoon of October 15, 2005, she was waiting on customers at the front of the store when she was called to the back of the store by Ms. Talley. When she got to the back of the store, [Petitioner] was there with Ms. Talley, holding a gun to her throat. She complied with [Petitioner's] instruction to open the office door. She testified that as she did this, [Petitioner] pointed his gun at her. The three of them went upstairs to the office. Ms. Swezea pointed out the money in the drawer on top of the safe and [Petitioner] told her to pick it up and give it to him.

Ms. Swezea testified that the gun [Petitioner] used was a small revolver, and that she was familiar with the difference between a revolver and a semi-automatic. After she gave him the money, he put the gun in her face and asked her if that was all the money. She told him he had all the money and he said, "well, if you're lying to me, I'm going to blow your head off." [Petitioner] then told her and Ms. Talley to get under the desk and count to twenty.

Ms. Swezea testified that after she and Ms. Talley got out from under the desk, she instructed Ms. Talley to call 911. She stated that she went to the front of the store, locked the doors, and told the remaining customers that if

they had seen anything they needed to stay, and those customers who had not seen anything needed to leave. She described the robber to police as five-and-a-half feet tall, wearing a toboggan and a black zip-up hooded jacket. She stated that [Petitioner] had the hood up, and was also wearing sunglasses and black pants. Ms. Swezea testified that she calculated how much money had been taken by reviewing the deposit log that she had filled out earlier that day when she brought the money from the cash register up to the office.

Ms. Swezea testified that she was present for [Petitioner's] preliminary hearing. She stated that she was not confident that she would be able to identify [Petitioner] on the basis of a facial identification. However, she stated that she knew [Petitioner] was the person who had robbed her because she was able to observe his walk, his mannerisms and was able to hear him speak during the hearing. She testified that the gun shown to her matched the type and size of gun [Petitioner] used in the commission of the robbery.

On cross-examination, Ms. Swezea testified that she could not remember which police officer she had given her statement to on the day of the robbery. She stated that her judgment of the robber's height was based on his being roughly the same height as her. Ms. Swezea also stated that [Petitioner] had a unique walk that was "kind of a swagger."

*Id.* at *1-4. Petitioner led police on a high-speed chase before finally coming to a stop near the fairgrounds. *Id.* at *4. Petitioner's van was searched by a police officer. During the search:

[S]everal items [were located] which [the officer] secured and later placed in the evidence room at the Goodlettsville Police Department. Among those items was a fully loaded and cocked pistol. [The officer] also found a black jacket with a hood on it, three stocking caps, and clear rubber gloves. All of those items were located inside a backpack in [Petitioner's] van. [Petitioner had possession of] a quantity of cash. [The officer] took custody of the cash, counted it, and noted the amount to be $1,365. [The officer] turned the cash over to the property room, along with the other items that were recovered.

*Id.* at *4. Petitioner testified at trial as follows:

[D]uring the months prior to the robbery of the Family Dollar Store, he and his wife had one vehicle that they shared. [Petitioner] and his wife had conflicting work schedules and needed an additional vehicle. [Petitioner] stated that the

-4-

gun found in the van was shared by his family. He testified that he lived in a dangerous housing project where robberies were frequent and the gun was used by his wife for protection. He testified that he had $1,365 on his person on the day of the robbery because he was hunting for a second used car. He stated that he had looked through the newspaper and circled the addresses of people who were selling cars. [Petitioner] testified that he was in Goodlettsville checking on two potential vehicles for sale on the day of the robbery.

[Petitioner] testified that he had not been in the Goodlettsville Family Dollar Store on the day of the robbery. [Petitioner] admitted that he pled guilty to evading arrest based on the police pursuit. He stated that he fled from police because he was scared, and because he had a history of bipolar and schizophrenic mental illness. He stated that he also suffered from Attention Deficit Disorder and personality disorders. He stated that he took medications to control these disorders, and he admitted that he was testifying at trial under the effects of those mind-altering medications. [Petitioner] also testified that he had been convicted of two separate counts of theft of property under $500 in 1998. He admitted that in 2000, he was convicted of the theft of property with a value between $500 and $1000.

On cross-examination, [Petitioner] testified that he did not have an expert who could testify as to his medical mental health history, or to what his mental health status was on the day of the robbery. He stated that he had looked for a car for a month-and-a-half, and every time he looked he took approximately $1,400 with him, despite the fact that he lived in a dangerous neighborhood. [Petitioner] also testified that he made phone calls to look at the cars that he was interested in on the day of the robbery. However, [Petitioner] stated that despite having several months to prepare for trial, he was unable to obtain a copy of his cell phone records from that day, verifying that he had in fact made those calls.

[Petitioner] testified that with regard to two or three of the cars listed in the newspaper, he did not call ahead but simply went to the addresses provided in the newspaper. When asked if he could produce a newspaper with a car listing that featured an owner's address, [Petitioner] was unable to do so. [Petitioner] stated that the reason that he panicked and fled from police was that he had the gun in his pocket and it was unregistered. [Petitioner] also stated that the backpack that was found in the van belonged to one of his children.

*Id.* at *5. Prior to trial, Petitioner pled guilty to felony evading arrest while operating a motor vehicle. After hearing the evidence, the jury found Petitioner guilty of aggravated robbery and aggravated assault. The trial court sentenced Petitioner to twelve years for aggravated robbery. He was sentenced to ten years for aggravated assault and to eight years for evading arrest while operating a motor. The court ordered that the sentences run consecutively for a total effective sentence of thirty years. *Id.*

On direct appeal, Petitioner argued: (1) that the evidence was insufficient; (2) that the trial court erred by permitting the state to enter the classified section of a local newspaper as rebuttal evidence; (3) that his sentences were excessive; and (4) that the trial court erred by imposing consecutive sentencing. *Id.* at *1. This Court affirmed both the convictions and the sentences. *Id.*

Petitioner did not seek permission to appeal to the Tennessee Supreme Court. Instead, he filed a timely pro se petition for post-conviction relief. The post-conviction court determined that the initial pro se filing did not set forth any grounds appropriate for post-conviction relief, so the court gave Petitioner fifteen days to supplement his petition. Petitioner asked the court for counsel to be appointed. The post-conviction court entered a second order, asking Petitioner to provide adequate grounds for relief in the petition. Petitioner complied with this order. Counsel was appointed by the post-conviction court. The post-conviction court informed Petitioner that he would not be able to pursue any claims with regard to his guilty plea.

An amended petition for post-conviction relief was filed. In the petition for relief, Petitioner alleged that trial counsel: (1) failed to subpoena material witnesses or call material witnesses to testify at trial, specifically his wife and uncle; (2) failed to hire an investigator; (3) failed to conduct an independent fingerprint analysis on fingerprints of the door of the Family Dollar; (4) failed to prepare him for trial; (5) was ineffective during jury selection; (6) never visited him while he was in jail; and (7) failed to inquire about certain items of evidence during Petitioner's testimony.

The post-conviction court held a hearing on the petition for relief. At the hearing, Petitioner testified that he met with trial counsel "three or four" times prior to trial but that they did not "discuss strategy or anything for the trial" during those meetings. Petitioner claimed that he requested for trial counsel to come visit with him at the jail by writing him "at least two letters." Trial counsel could not answer the questions that Petitioner had about witnesses and complained that trial counsel "failed" in many ways. Petitioner complained that trial counsel would not tell him about the conversation he had with Petitioner's wife and did not interview his "uncle," Alvin Hill, as potential witnesses.

Petitioner stated that trial counsel did not ask him about the items that were found in his van during his testimony at trial. Further, Petitioner claimed that he had "no idea" what trial counsel was going to ask him during his testimony at trial. Petitioner testified that he attempted to get a new attorney appointed prior to trial by writing a letter to the Public Defender's Office.

Petitioner claimed that trial counsel was ineffective during jury selection because there was only "one black man" on the jury and the prosecutor managed to exclude three or four potential black jurors from the case.

One of Petitioner's main complaints was that trial counsel failed to adequately interview his wife, Latoya Rochelle, who could have accounted for the large sum of cash that Petitioner had on his person when he was arrested. Petitioner claimed he was looking for a new car that day. Petitioner also wanted trial counsel to call several character witnesses and present proof that Petitioner did not have a "distinctive walk" to rebut the testimony of one of the victims, who claimed that they identified Petitioner as the robber by his walk.

Alvin Wayne Hill also testified at the post-conviction hearing. He met Petitioner at Burger King, and they became close friends. Petitioner even lived with Mr. Hill for approximately two years prior to getting married. Mr. Hill considered Petitioner a part of his family, referring to Petitioner as his "play nephew." Mr. Hill would have testified that Petitioner was interested in buying a car at the time he was arrested. Additionally, Mr. Hill knew that Petitioner was employed. Mr. Hill stated that he could not recall anything distinctive about Petitioner's gait.

Trial counsel testified that he had been licensed to practice law since 1976 and had been with the Public Defender's Office for a total of twenty-two years and eight months. According to trial counsel's log book, he made direct contact with Petitioner at least twelve times, not counting at least five letters that were written to Petitioner prior to trial. Trial counsel stated that he would have considered Petitioner's wife to be a "marginal witness" and her testimony "would have minimal impact or maybe even no impact" on the case. Trial counsel explained that the jury could have believed Mrs. Rochelle's story that Petitioner was going out to buy a car that day but that would not prevent Petitioner from later going to rob the store. Further, trial counsel was hesitant to introduce evidence of Petitioner's good character for fear that he would have opened the door to evidence of bad character.

Next, trial counsel specifically recalled that Petitioner wanted "a larger number of people who were black" on the jury. Trial counsel went on to specifically recall a number of jury challenges and explain why certain challenges were made for certain jurors.

Lastly, on cross-examination, trial counsel admitted that he was not sure if he interviewed Petitioner's wife prior to trial. He recalled attempting to contact her prior to trial but could not remember if he was successful.

Petitioner's wife, Latoya Rochelle, testified that she had been married to Petitioner for a few months at the time he was arrested. According to Mrs. Rochelle, Petitioner left that morning "going out looking for a new car." Mrs. Rochelle stated that they had been looking for a car since February, or about eight months, but that Petitioner had never actually been out to look at cars. Instead he was looking in the newspaper and "the Thrifty Nickel." Petitioner was working at a warehouse at the time, where he was paid weekly. Petitioner "routinely" cashed his paychecks and placed them in a "black safe" at the house. Mrs. Rochelle stated that Petitioner had "like $1,300, and [Petitioner] woke [her] up [that morning] to get $200." Mrs. Rochelle recalled talking to trial counsel "a little bit" but could not recall if it was after trial or before trial. Mrs. Rochelle was not subpoenaed for trial but claimed that she would have testified had she been asked.

On cross-examination, Mrs. Rochelle denied that Petitioner called her or got in touch with her to try to get her to testify at trial. Mrs. Rochelle claimed that she did not really know what Petitioner's charges were about.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. The State then filed a motion to reopen the proof. Along with the motion, the State entered recordings of telephone calls between Petitioner and Mrs. Rochelle made after Petitioner was incarcerated. The post-conviction court granted the motion. The telephone calls prove that Petitioner communicated with his wife in spite of her denial of that fact on the witness stand. The telephone calls indicate that Petitioner was coaching Mrs. Rochelle on what to say, and Petitioner led Mrs. Rochelle to believe that he would sign divorce papers if she testified that Petitioner was going out that day to look for a car with $1,300.

The post-conviction court entered an order denying post-conviction relief and dismissing the petition. Petitioner filed a timely notice of appeal.

*Analysis*
*Post-Conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d

572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Shields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, Petitioner complains that trial counsel failed to interview his wife even though she was available to testify. At the post-conviction hearing, trial counsel testified that

he tried to get in touch with Mrs. Rochelle prior to trial but was not successful. Trial counsel felt that she would have been a "marginal" witness because her testimony, even if true, "would not have a significant impact on the case." Mrs. Rochelle testified at the post-conviction hearing that if called for trial, she would have testified that Petitioner had approximately $1,500 on his person the day of the robbery because he was looking for a new car. She also testified that Petitioner routinely cashed his paychecks. Mrs. Rochelle denied talking to Petitioner prior to trial. After the hearing, when the State moved to reopen the proof, the call log from the jail was introduced into evidence, along with recordings of several phone calls between Petitioner and Mrs. Rochelle. The post-conviction court was "unable to find that [Mrs. Rochelle] not testifying at trial caused any prejudice to Petitioner." In fact, the post-conviction court held that Petitioner's defense was adequately raised by the proof. Additionally, the post-conviction court noted that the telephone calls from the jail indicated that Petitioner "attempted to coach his wife to testify as to certain things in his post-conviction hearing and possibly cause his wife to perjure herself on his behalf." The post-conviction court stated that both Petitioner's and Mrs. Rochelle's testimony lacked credibility and that the testimony of trial counsel was credible. The evidence does not preponderate against the judgment of the post-conviction court. Petitioner is not entitled to relief on this issue.

Next, Petitioner complained that trial counsel failed to investigate or subpoena any other character witnesses. Petitioner called his "uncle" to testify at the post-conviction hearing to support this claim. Mr. Hill testified about where Petitioner lived, that Petitioner was employed, and that Petitioner was in the process of buying a car. The other witnesses, according to Petitioner, would have testified that Petitioner was a hard worker. Petitioner did not present these witnesses at the post-conviction hearing. Petitioner must present witnesses at the post-conviction hearing to prevail on a claim of deficient representation for failing to call a witness at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). A post-conviction court may not speculate, "on the question of . . . what a witness's testimony might have been if introduced at trial." *Id.* Further, trial counsel stated that it was a matter of strategy to limit the character witnesses for fear of opening the door to evidence of bad character. Petitioner has failed to show prejudice by trial counsel's failure to call these witnesses at trial.

Next, Petitioner argues that trial counsel failed to adequately examine Petitioner about the items found in the van on the night he was arrested. Petitioner complained that trial counsel did not ask him about a blue shirt found on the floorboard of the van. The shirt was never connected to the crime. The post-conviction court reviewed this claim and determined that Petitioner "was unable to provide any testimony to explain those items" at the evidentiary hearing. The evidence does not preponderate against the conclusion of the post-conviction court. Petitioner is not entitled to relief on this issue.

Petitioner also argues that trial counsel failed to adequately prepare Petitioner for testifying at trial. Petitioner complained that had he been prepared, his testimony would have been more credible. Petitioner denied that trial counsel discussed his testimony prior to trial. At a later point during the post-conviction hearing, Petitioner admitted that he knew what trial counsel planned to do but that he was "just blind" for most of the trial. Trial counsel testified that he met with Petitioner prior to trial to discuss strategy and was aware that Petitioner intended to testify prior to trial. Petitioner has failed to show prejudice by trial counsel's alleged failure to prepare Petitioner for his testimony. Petitioner is not entitled to relief on this issue.

Petitioner argues on appeal that trial counsel was ineffective during jury selection because there was only "one black man up there." At the hearing on the petition, the post-conviction court recalled that the State exercised eight peremptory challenges and trial counsel exercised four. Petitioner failed to raise this issue on direct appeal. An issue not raised when it can be raised is deemed waived. *Teague v. State*, 772 S.W.2d 915, 923-24 (Tenn. Crim. App. 1988). An issue is considered waived when appellant failed to present it for determination on direct appeal. T.C.A. § 40-30-106(g). Exceptions to the rule are allowed if: (1) the claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or (2) the failure to present the ground was the result of state action in violation of the federal or state constitution. *Id.* Petitioner does not allege that one of the exceptions applies herein.

Finally, Petitioner claims that trial counsel did not "adequately address that [sic] fact that he did not have a distinctive walk at the time of his preliminary hearing, a fact which the victims in this case said they used as a way of identifying him as the robber." Petitioner failed to include this complaint in any of his petitions for post-conviction relief. Petitioner raised this issue during his testimony without requesting an amendment to the petition for relief. The post-conviction court did not address the issue in the order denying post-conviction relief. Again, when an issue is not addressed with the post-conviction court, it will generally not be addressed on appeal. *Walsh v. State*, 166 S.W.3d 641, 645-46 (Tenn. 2005). Moreover, as stated previously, in a post-conviction proceeding, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless" the claim is based upon a newly-recognized constitutional right with retroactive application or the ground was not presented as the result of State action in violation of the federal or state constitution. T.C.A. § 40-30-206(g); *see State v. Benson*, 973 S.W.2d 202, 208 (Tenn. Crim. App. 1998). Neither of the exceptions is present herein. We determine that this issue is waived. *See* T.C.A. § 40-30-106(d) ("The petition must contain a clear and specific statement of all grounds upon which relief is sought, including

-11-

full disclosure of the factual basis of those grounds."); *see also* Tenn. Sup. Ct. R. 28, section 5(E) ("The petition shall contain . . . (3) each and every error that petitioner asserts as a ground for relief, including a description of how petitioner was prejudiced by the error(s)."). Accordingly, we conclude Petitioner is not entitled to relief on this issue because he failed to comply with the rules governing post-conviction relief. "Furthermore, the plain error rule, which would otherwise permit an appellate court to address the issue sua sponte, may not be applied in post-conviction proceedings to grounds that would otherwise be deemed either waived or previously determined." *Grindstaff v. State*, 297 S.W.3d 208, 219 (Tenn. 2009) (citing *State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000)) (footnote omitted). This issue is waived.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JERRY L. SMITH, JUDGE

-12-